UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------X
UNITED STATES OF AMERICA

       -v-

                         16 Cr 281 (PGG)

INES SANCHEZ,

                Defendant.
--------------------------------------------------X

## SENTENCING MEMORANDUM ON BEHALF OF INES SANCHEZ

Alan M. Nelson, Esq.
3000 Marcus Avenue, Suite 1E5
Lake Success, New York 11042
(516)328-6200

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------X
UNITED STATES OF AMERICA


                        -v-
                                                    16 Cr 281 (PGG)
INES SANCHEZ,

                        Defendant.
--------------------------------------------------X

## I. PRELIMINARY STATEMENT

Ines Sanchez is to appear before your Honor to be sentenced, pursuant to her plea of guilty to Count One of the instant Indictment, a violation of 18 U.S.C. § 1962(d), Conspiracy to Commit Racketeering on September 4, 2018. The conduct underlying the charge contained in the Indictment concerns Sanchez' participation in a criminal enterprise identified as the Blood Hound Brims ("BHB") between 2013-2016 - and how she eventually served as "Godmother" for the BMB's for a period of that time.

The defendant submits that there are important aspects of Ines Sanchez' personal history and the nature and circumstance of her participation in offense that warrant the Court's consideration in determining whether to impose a sentence below the advisory guideline range. Although the Pre-sentence Investigation Report ("PSR") provides a great deal of information about Ms. Sanchez' personal history (including her alcohol addiction and prior mental health concerns) - as well as information relevant to the instant offense and sentencing - we hereby submit this Memorandum as a supplement to the information reported in the PSR.

1

## II. BACKGROUND

As both the Psychiatric Report of Dr. Eric Goldsmith and the Pre-Sentence Report each

recognize:

> "Ines Sanchez was exposed to a childhood of deprivation and
> trauma. Her father, who had a significant substance abuse
> problem, raped her sister resulting in the birth of a child. Ms. Sanchez
> was the victim of repeated sexual abuse. She was inappropriately
> touched and raped by her cousin... During her previous New York
> State incarceration [she] was subject to grooming behaviors by a
> male Correctional Officer, who later sexually assaulted her. She
> was repeatedly raped. She felt powerless. She became suicidal
> and had multiple suicide attempts while previously
> incarcerated.
>
> Ms. Sanchez has experienced posttraumatic symptoms stemming
> from her traumas. She has experienced upsetting traumatic
> memories, distressing dreams, chronic feelings of detachment and
> depression. She has experienced hyper-vigilance with extreme
> feelings of vulnerability. She has abused alcohol in the past in part
> to numb her emotional pain".
>
> (See Exhibit "A" Psychiatric Report Dr. Eric Goldsmith pages 1-2).

Dr. Goldsmith opines:

> "In Ms. Sanchez's experience, most men have exploited and
> sexually abused her. She has felt powerless to assert herself
> and so has repeatedly been victimized. However, in the
> gang, she felt safe from sexual attack. In her role with the gang
> the men respected her and were not abusive. She was enticed by
> the experience of feeling protected. It became a highly influential
> factor in her decision to take on the role of "godmother" to the
> gang."
>
> (See Exhibit "A" Psychiatric Report Dr. Eric Goldsmith pages 2,5-6).

That sentiment is echoed in Probation's Recommendation that the Court vary below the

advisory Guideline sentencing range stating "[w]e acknowledge Sanchez's apparent mental

health needs after previously suffered sexual and physical abuse, coupled with her alcohol issues", in recommending that a non-guideline sentence appears appropriate in this case. (See PSR page 24.

Ms. Sanchez does not offer her extraordinarily difficult past and underlying difficulties it has created as an excuse for her conduct and accepts full responsibility for her participation in BHB. As Ms. Sanchez states in her letter to the Court "I take full responsibility for disseminating BMB paperwork, organizing meetings and my leadership role". (See Exhibit "B" - Letter of Ines Sanchez).

Rather this information is offered to the Court to gain a better understanding as how and why Ines Sanchez came to participate in the affairs in BHB in the unique manner in which she did.

Since her arrest, some 20 months ago, and while awaiting sentencing in the MCC Ms. Sanchez has been an exemplary inmate. She has participated in the BOP's six month intensive Drug and Alcohol Treatment Program (Exhibit "C"), the Lead by Example Violence Prevention Mentoring Program (Exhibit "D"), a 13 week extensive course offered by the BOP "Victim Impact: Listen and Learn"; (Exhibit "E");  as well as numerous life skills and academic programs offered in the MCC (See Exhibit "F"- Basic Cognitive Skills; Exhibit "G"- Parenting, Prison and PUPS; Exhibit "H"- Parenting Inside Out; Exhibit "I"- Suicide Prevention; Exhibit "J"- Anger Management; and Exhibit "K" - Adult, Child and Infant CPR and Exhibit "L" - nine Academic Courses).

Contemporaneously Ms. Sanchez has enrolled in the facility's GED Program and maintained full employment as both a laundry worker and custodian (See Exhibit "M").

Recognizing her on-going need for psychiatric counseling Ms. Sanchez has attended 19 two hour counseling sessions through the MCC Psychology Services Unit. while maintaining an exemplary disciplinary record. (See Exhibit "N" Psychology Attendance Log and Exhibit "O" Disciplinary Record).

During her imprisonment Ines has suffered the misfortune of the loss of her sister Carmen Garcia who passed away in June 2017 from colon cancer and the continued decline in health of her mother Nancy Cuevas. (See PSR ¶¶ 60,61 and 68). The death of Ms. Sanchez' sister was particularly difficult because prior to her arrest she had been the primary caretaker for Carmen and her five young children, who had been residing along with Ines in the home of Nancy Cuevas. (See Exhibit "P"-"R" letters from Joanna Vaquerano; Migdalia Cuervas; and Thomas Griffin - Ms. Sanchez' siblings).

Ms. Sanchez had developed a particularly strong relationship with the youngest of the children, Angel Ivory Garcia. Prior to her arrest Ines had been the primary person responsible for bringing her sister Carmen to chemotherapy treatments and her mother for dialysis. Following her sister's death four of the children were placed with her oldest sister Migdalia Cuervas and Angel Ivory moved to live with his father Gabriel Garcia in Minneapolis, Minnesota. Ms. Sanchez' inability to assist during this traumatic time has significantly affected her . She is determined upon release from custody acquire her GED and assist in the care of her mother. As Dr. Goldsmith reports hin his psychiatric evaluation Ines' ultimate goal following her acquisition of her GED, hence rendering her more capable of acquiring employment to move from the Bronx to Minnesota to help Gabriel Garcia raise Angel, her sister's youngest son, in a an environment far removed from the traumas of the Bronx she and her family have endured over the past

4

generation. (See Exhibit "A" page 3, ¶ 1).

As the annexed letters from her mother, family and friends attest, what was once a troubled relationship is now a strong family unit which will facilitate her integration back into the community and eventual move to Minnesota her growth as a single parent. (See Exhibits "P" - "AA").

Diagnosed with Post Traumatic Stress Disorder, chronic, Dr. Goldsmith in his evaluative report opines:

> Ines Sanchez recognizes the role that childhood trauma and abuse have affected her adult behaviors. She is committed to continuing therapy to help her work through posttraumatic symptoms, maintain sobriety and shore up coping strategies. She has realistic plans for the future and is engaging in productive activities while incarcerated at the MCC. Ines Sanchez can benefit from continued psychotherapy in the community to assist in recovering from her chronic PTSD condition.

(See Exhibit "A" Goldstein Report at 7).

By this memorandum and for the reasons more fully set forth herein Ines Sanchez respectfully requests that the court impose a sentence based upon all the factors set forth in 18 U.S.C. §3553(a), Gall v. United States, 128 S.Ct. 586 (2007), Kimbrough v. United States, 128 S.Ct. 558 (2007); United States v. Booker, 125 S.Ct. 738 (2005) and United States v. Cavera, 550 F.3d 180 (2nd Cir. 2008). At the outset we respectfully submit that in applying those factors a sentence of Time Served, a period of twenty imprisonment and a term of Supervised Release with Special Conditions of mental health and alcohol treatment is warranted. This recommendation, is for a non-guideline sentence.

It is submitted that such a sentence is a sentence firmly rooted in the letter and spirit of the guidelines and more significantly it is sentence "sufficient but not greater than necessary" to

fulfill the purposes of sentencing.  See 18 U.S.C. 3553(a).

## II. GUIDELINE CALCULATIONS

Upon review of the Pre-Sentence Report (PSR) prepared by the Probation Department the defendant agrees with the advisory calculation, except to the extent that it rejects the Criminal History Calculation set forth in the plea agreement.

The defendant fully agrees with the factual contention of Probation that the Criminal History Points attributed to Ms. Sanchez' October 15, 2002 conviction involved a single incident concerning a single victim which occurred on the same day which was contained in the same accusatory instrument and were clearly part of the same common plan or scheme.

However, as stipulated in the plea agreement, pursuant to U.S.S.G. § 4A.1.1(e), Counts Five and Six of the underlying indictment (for guideline but not post Johnson substantive offenses), would technically be "crimes of violence" for which additional 3 additional CHC points were not included because the matter was clearly a single sentence.

Nonetheless, the defendant submits that the attribution of six criminal history points to this single offense clearly overstates Ms. Sanchez' criminal history warranting a variance pursuant to 18 U.S.C. § 3553, akin to Probations' determination that the advisory sentencing range should be 41-51 months.

## IV.   NON-GUIDELINE SENTENCE

It is against this background that the defendant asks that the court evaluate his request for the imposition of a non-guideline sentence.

## I. Post Booker Sentencing

In the wake of United States v. Booker, 125 S.Ct. 738 (2005) the Second Circuit in

6

United States v. Crosby, 397 F.3d 103 (2nd Cir. 2005) and more recently in United States v.

Cavera, 550 F.3d 180 (2nd Cir. 2008) has instructed district courts with some pertinent

suggestions as to the appropriate procedure to follow in sentencing.  In a series of subsequent

decisions the Supreme court and the Second circuit have confirmed that under the advisory

Guidelines regime, "a sentencing judge has very wide latitude to decide the proper degree of

punishment for an individual offender and a particular crime.  Gall v. United States, 552 U.S. 38

(2007); Kimbrough v. United States, 552 U.S. 85 (2007; and Nelson v. United States, 129 S. Ct.

890 (2009).

     In so doing the Court in Gall stated:

> As a matter of administration and to secure nationwide consistency, the
> Guidelines should be the starting point and the initial benchmark.  The
> Guidelines are not the only consideration however.  Accordingly, after
> giving both parties an opportunity to argue for whatever sentence they deem
> appropriate, the district court should then consider all of the 3553(a)
> factors to determine whether they support the sentence requested by a party.
> In so doing he may not presume that Guideline range is reasonable...
> He must make an individualized assessment based upon the facts presented.
> If he decides that an out-side the Guidelines sentence is warranted, he must
> consider the extent of the deviation and ensure that the justification is
> sufficiently compelling to support the degree of variance.

Gall at 49-50.

     In Nelson v. United States , 550 U.S.350, 129 S.Ct. 890, 891-92 (2000)(per curium), the

Supreme Court observed "Our cases do not allow a sentencing court to presume that a sentence

within the applicable Guidelines range is reasonable... The Guidelines are not only not

mandatory on sentencing courts, they are also not to be presumed reasonable".

     As noted above while the correct advisory guideline range is 51-63 months, a variance to

41-51 months, for the reasons stated above it is submitted is appropriate here due to an

7

overstatement of Ms. Sanchez Criminal History in applying U.S.S.G. §. 4A1.1(e). The advisory range should not be followed because it is greater than necessary to promote the goals of sentencing and fails to give due consideration to all of the factors set forth in 18 U.S.C. 3553(a). This would yield an advisory sentencing range of 41-51 months imprisonment.

As discussed herein, it is submitted, as Probation recommends that the court should vary below that range.   Although Probation recommends the court vary and impose a sentence of 38 months imprisonment, for the reasons discussed herein, we ask the Court in applying the factors set forth in 18 U.S.C. § 3553(a), that the Court vary and impose a sentence of 20 months imprisonment.

A. ***The Purposes of Sentencing In this Case Are Satisfied By A Non-Guideline Sentence.***

18 U.S.C. 3553(a) requires a Court to impose a sentence that is reasonable, one that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2 of this subsection."  Section 3553(a)(2) states that such purposes are:

    A.  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    B.  to afford adequate deterrence to the criminal;
    C.  to protect the public from further crimes of the defendant, and;
    D.  to provide the defendant with needed educational or vocational training medical care, or other correctional treatment in the most effective manner.

These purposes in this case would all be satisfied by a non-Guidelines sentence.

Generally speaking, "deterrence, incapacitation and rehabilitation are prospective and societal - each looks forward and asks: What amount and kind of punishment will help make society safe.  In contrast, retribution imposes punishment based upon a moral culpability and asks: What penalty is needed to restore the offender to moral standing within the community?

See United States v. Cole, 662 F. Supp. 632, 637 (N.D. Ohio 2008).

       The answer to the first question in this case is that society is safe and need have no fear of Ines Sanchez. As evinced by her post-offense conduct over the past two years she has learned her lesson in this case and indeed in life and taken it to heart. She will not commit any further crimes. She realizes that what she did was wrong and has harmed her family, herself and in particular society in general.

       A lengthy period of incarceration is not needed to restore Ines Sanchez to moral standing within the community. Data provided in the Sentencing Commission's own studies reflects that offenders who have an education, ability to work, and a strong family relationship with children and parents, pose substantially little if no risk of recidivism. *See Measuring Recidivism: the Criminal History Computation of federal Sentencing Guidelines* (May 2004).[1] *Recidivism and the First Offender* (May 2004),[2] and *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score* (Jan. 4, 2005).[3]

       Indeed, here Ines seeks early release to facilitate her acquiring her GED, assist her mother, who now resides alone in an apartment she can share in attending her thrice weekly dialysis treatments and prepare to move from New York to Minneapolis to assist in rearing her late sister's youngest child.

       Second, with respect to the need for a sentence to afford adequate deterrence to criminal

---

[1] Available at http://www.ussc.gov/publicat/Recidivism_General.pdf.

[2] Available at http://ussc.gov/publicat/Recidivism_First Offender.pdf.

[3] Available at http://ussc.gov/publicat/Recidivism Salient FactorCom.pdf.

conduct, it is respectfully submitted that the imposition of a guidelines sentence as compared to some lesser sentence would not have any bearing on deterrence and we are not aware of any empirical data establishing that it would. In fact, the data is to the contrary. In one of the best studies of specific deterrence, which involved white collar offenders (presumably the most rational of potential offenders) in the pre-guidelines era, no difference was found, even between probation and imprisonment. See David Weisberg, eta l., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995). The study concluded that the "correlations between sentencing severity and crime rates... were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects."

What does create a significant deterrent effect is the necessity created for the defendant to avoid punishment combined with a commitment to the moral obligations of the community.

As discussed above Ines is in fact dedicated and has set in place a plan for precisely those purposes.

As discussed herein Ines Sanchez has made significant strides in her life over the course of the past 20 months. During that six year period Shayna Roser has led an exemplary life; participating in a plethora of courses for self improvement; continuing mental health treatment and counseling and working on a full time basis as a MCC staff cadre.

Abstinent since arrest Ms. Sanchez has continuously received both mental heath and substance abuse counseling  Diagnosed with PTSD, chronic she is and will continue to receive appropriate mental health care.

It is the fervent hope of the defense that this Court in examining the statutory goals of

10

promoting respect for the law, providing just punishment for the offense; and affording adequate

deterrence to the criminal while; protecting the public from further crimes of the defendant those

goals are further by the imposition of a non-guideline sentence.

**B.** ***Analysis of the 3553(a) Factors Strongly Supports Imposition of a Sentence of Probation***

       18 U.S.C. 3553(a) additionally directs the sentencing court to consider the nature and

circumstances of the offense, the history and characteristics of the defendant, the kinds of

sentences available, the guidelines sentencing range and policy statements, the need to avoid

unwarranted sentencing disparities amongst defendants involved in similar conduct with similar

criminal history, and the need to provide for restitution to any victim(s) of the offense.

       The directives of <u>United States v. Booker</u>, 543 U.S. 220 (2005) <u>United States v. Crosby</u>,

397 F.3d 103 (2nd Cir. 205), and 3553(a) make clear that courts must consider all the factors in

355(a), many of which the Guidelines either reject or ignore, or demand to an "extraordinary

degree". Indeed, in some cases, the Guidelines clash outright with 3553(a)'s primary directive:

"to impose a sentence sufficient but not greater than necessary to comply with the purposes" of

sentencing.

      As the Second Circuit observed in <u>United States v. Jones</u>, 551 F.3d 163, 182 (2d Cir
2008)

> it is the district court's particular trust to ensure the uniform and
> constant principle of the federal sentencing tradition, specifically,
> that "every convicted person [be considered] as an individual and
> every case as a unique study in the human failings that sometimes
> mitigates, sometimes magnify, the crime and the punishment to ensue."

      Sentencing is not an exact science. Rather it is a fluid and dynamic process. Its aim

should be to impose a sentence that is reasonable and fair and just given the facts of a particular

case and the facts relative to the particular person being sentenced. See Rita v. United States,

551 U.S. 338 (2007), Irizarry v. United States, 128 S.Ct. 2198 (2008). An analysis of the 3553(a)

factors in this case militates in favor of Ines Sanchez and the imposition of a sentence of less

than the properly calculated total Guideline range. As discussed herein an analysis of the 3553(a)

factors would warrant the imposition of a sentence of 20 months imprisonment.

## II. Factors Warranting Imposition of Non-Guideline Sentence

In considering the imposition of a non-guideline sentence it is respectfully requested that

the court consider the factors articulated in 18 U.S.C. 3553(a) as they apply to Ines Sanchez.

### A. *Nature and circumstances of the offense & history and characteristics of the defendant.*

### 1. *Nature and circumstances of the offense*

The Court is well aware of the circumstances of the defendant's participation in the

offense having had the opportunity to review the PSR and the factors set forth above in some

detail above and in detail in the government's motion, those details will not be repeated.

Nonetheless Ines Sanchez background, how she became involved in the offense, and most

significantly her while participating as what the government has characterized as a the role

of "Godmother" of the BHB's is important for the Court to understand.

Ines Sanchez was release from custody from a New York State Correctional Facility

following her serving a 10 year period of imprisonment on January 3, 2012. Both prior to and

during her imprisonment she had no participation in the BHB's and had never been affiliated

with any gang.

During late 2012 she began a romantic relationship with Eric Grayson, a co-defendant

herein, who has been sentenced by this Court to one year imprisonment. I mid-2013 Ms.

Sanchez suffered a miscarriage having become pregnant by Grayson.  During 2013 Sanchez

came to be acquainted with members of BHB.   In particular she became friends with Latique

Johnson who was imprisoned on state court charges late in 2013.

Following Johnson's arrest Sanchez was recruited by Grayson and Johnson to deliver

commissary funds to Johnson at Riker's Island and to convey messages between Johnson and

Grayson concerning BHB matters.   The messages were initially strictly financial; i.e. instructing

the BHB leadership to whom and what amounts of funds to deposit in gang member commissary

accounts.

In early 2014 following the arrest of another BHB member "Mula", who had previously

been in charge of organizing and conducting regular clique meeting, i.e. "pow wows" or "9-11s"

on state charges and as Sanchez' relationship with Johnson became closer, he requested that she

assume his responsibilities of organizing the meetings. As PSR ¶ 18 indicates in that capacity

she assumed the responsibilities of collecting dues and maintaining the kitty and disseminating

rules and regulations governing meetings.   However Sanchez was never considered to be either a

"High" or "Low" and hence the gang's line-up and never considered to be in line to succeed

Johnson.   Indeed the rules of BHB strictly excluded  females from such a ranking and forbade

females from participating or being provided with information concerning the violent acts of

BHB.

Commencing in early 2014 Sanchez in this capacity arranged for six separate "pow

wows".  During that same time she met with and spoke regularly by telephone with Johnson.

In this capacity she notified members of meetings, scheduled the locations, collected dues at the

meetings and held the kitty for the disbursement of funds to incarcerated gang inmates

13

commissary accounts.   Additionally she conveyed messages to BMB members concerning the collection and disbursement of funds, which funds she was aware came from dues which were to a large extent the proceeds of narcotics sales and were to disbursed to purchase narcotics and firearms.

However, contrary to the statements contained in PSR ¶¶ 24 and PSR page 23, Sanchez was not permitted to participate in any discussions concerning "violence against other gang rivals."

Indeed, this is clearly demonstrated in a review of the recordings between Sanchez and Johnson made during the six "pow wows" .  Each of the recordings make clear that Johnson communicates to the BHB members that they are to follow Sanchez instructions as if they were his concerning financing, rules and communications.  However, she then ordered by Johnson to turn over her telephone to individual members in attendance at the meeting during which they separately discus narcotics transactions and/or acts of violence outside of Sanchez' presence.

Significantly, each of the four violent racketeering acts charged in the Indictment occur prior to Sanchez' involvement with BHB.  (RA 1 - 4/3/09; RA 2 - 2-11-2012; RA -3- 1/23/12 and RA 4 9/26/12).

Ines Sanchez does not dispute that her role qualifies her for a for level enhancement pursuant to U.S.S.G. § 3B1.1(a) as an organizer, leader , manager or supervisor or five or more participants in BHB.   Nonetheless, she is far from the traditional such individual.  A defendant must be an actual supervisor in the criminal conduct (See U.S. v. VanMeter, 278 F.3d 1156 (10th Cir. 2002)).  The is no doubt that Sanchez qualifies as same as it relates to the RICO conspiracy, but she does not as it relates to their specific acts of criminal conduct in

14

furtherance of the enterprise.

Nonetheless her leade4rship role it is far from the typical role that leads to a four level

enhancement, given the restrictions placed upon her full knowledge of and participation in

the most heinous acts of BHB.

Moreover, as Dr. Goldsmith explains in his Psychiatric Evaluative Report:

> "Ines Sanchez reports that she was introduced to the gang
> by a member who used to date her sister. Ms. Sanchez states that
> almost immediately, she experienced her role with the male gang
> as a place of safety. She says, "I was trusted." "They knew I had
> been in prison for 10 years and they could trust me."
>
> Because Ms. Sanchez had had the experience of being repeatedly
> exploited and sexualled abuse by men, she found her involvement
> with the gang to have bn an anxiety relieving experience with
> respect to her safety. She states "Im around all these men where every
> man in my life had done something wrong to me. But these gang
> members, I wasn't raped. It made me feel wanted and protected."
> She says, "no one could touch me or hurt me no more." Ms. Sanchez
> states that feeling of being protected and safe greatly diminished her
> anxiety. Her mood improved. She describes this feeling of safety
> as being the influential factor in her decision to take on the role
> of "godmother" to the gang."

(See Exhibit "A" Goldsmith Report at page 5-6).

In United States v. Koon, supra, the Supreme Court found that the Sentencing Reform

Act authorizes district courts to depart in cases that feature aggravating or mitigating

circumstances of a kind or to a degree not adequately taken into consideration by the Sentencing

Commission. Justice Kennedy, writing for the Court advises that the Sentencing Commission

has formulated each guideline  to apply to a "heartland of typical cases". Atypical cases were

"not adequately taken into consideration," and factors that may make a case atypical provide a

potential basis for departure. Koon, supra, See U.S.Cr.L. Vol. 59, at p.2135.

15

In analyzing both <u>Koon</u> and <u>post-Koon</u> authority it is clear that certain general principals relevant to variance determinations pursuant to 18 U.S.C. §3553 have been established.  First, an offender characteristic or other circumstance that is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range may be relevant to this determination if such characteristic or circumstance is present to an unusual degree and distinguishes the case from the "heartland" cases covered by the guidelines in a way that is important to the statutory purposes of sentencing.

<u>Koon</u> further makes clear that the Sentencing Commission does not foreclose the possibility of an extraordinary case that, because of a combination of offender characteristics or other circumstances that are not ordinarily relevant differs significantly from the "heartland" of cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case.

In the post-<u>Booker</u> era it is respectfully submitted that the Court may seek guidance in determining the appropriate sentence to impose in the context of the factors set forth in 18 U.S.C. 3553 by comparing how such a factor was considered pre-<u>Booker</u> in considering whether a departure pursuant to U.S.S.G. 5K2.0 was appropriate.

It is submitted that the nature of Sanchez' role participation in the offense when considered in conjunction with the circumstances which led her to commit the offense present factors of a kind which exist to a degree that were not contemplated by the Sentencing Commission in  promulgating the Guidelines.  Indeed, who can envision the nightmare that befell her life or the psychological effects it caused that led to accept such an unusual role as the "godmother" of this BHB clique.  Her circumstances are well beyond the scope of those

16

contemplated by the Commission when enacting U.S.S.G. 3B1.1(a) and hence employing the analysis contemplated by <u>Koon</u> analysis is outside the "heartland" of the typical case contemplated by the leadership role enhancement.

It is therefore submitted that adequate reasons exist for the Court to varying below the advisory guideline range which has been enhanced by four levels due to her leadership role as "godmother" of the clique.

## 2. *Background & Characteristics of the Defendant*

How Sanchez came to participate in the offense and her actual role are as unique as her background and appearance in contrast to her co-defendants. As discussed above although called the "godmother" by her co-defendants, her role was indeed unique.

Her tragic background is described in some detail in the PSR and Dr. Goldsmith's report. Now 37 years of age, Ines Sanchez is the second youngest of eight siblings. Her biological father was a sexual predator with a significant substance abuse problem. He raped Ms. Sanchez older sister Nancy, causing her to become pregnant and leading to his arrest and placement of Ines and her siblings in foster care for over two years.

Upon return to her mother life did not much improve for Ines. Her older sister Migdalia's boyfriend attempted to rape her and forced her to participate in the sexual of abuse of her younger sister Caridad. She was sexually abused by two of her uncles, other male relatives and the boyfriends and partners of her older siblings throughout her childhood. (See Exhibit "A" - Goldstein Report Page 3).

Not surprisingly by the age of 13 Ines, lacking supervision or indeed any protection in the household took to the streets and began drinking heavily "in part to self-medicate negative

17

emotions". (See Exhibit "A" - Goldstein Report Page 3).

Needless to say her heavy drinking from ages 13-22 led to a series of failed relationships and dangerous street encounters. At age 20 Ines was shot in her left leg after being caught in the cross-fire or rival gangs in the Webster Avenue Hosing Project. A year later she was stabbed in the same leg by her then boy-friend as they were breaking up. (See Exhibit "A" - Goldstein Report Page 3; PSR ¶73).

Continuing to drink heavily on a daily basis Ines was a poor student requiring special assistance. She drooped out of Morris High School in the 10th grade.

Thereafter on October 15, 2002, her 22nd birthday she participated in the botched robbery of the local liquor store with her cousins Jason Quinones and Hasani Best. As discussed in some detail in PSR ¶ 52 during the robbery one of her cousins pushed to store owner to the floor causing his death. As described in Dr. Goldsmith's report upon returning to her family's apartment following the robbery each of her cousins raped her. Arrested shortly thereafter Ines was sentenced to 10 years in State prison.

Both the PSR and Dr. Goldstein's report describes in graphic detail how Ines was repeatedly and systematically raped by a prison guard, Joseph Reilly, throughout her stay in the Albion Correctional Facility, resulting in her attempting to commit suicide on two occasions. (See Exhibit "A" - Goldstein Report Page 5 and PSR ¶ 77).

Despite this almost indescribably difficult life Ines has maintained an extremely close relationship with her sisters, their spouses and her mother. Following release from prison in January 2012 Ines moved into her mother's home at 545 E 145 Street where she lived with her mother, sister Carmen Garcia and Ms. Garcia's five children. Her other siblings, as described in

their letters to the court live with a few blocks of the location.  All assisted in the care of their mother who suffers from liver disease and sister Carmen Garcia who had been diagnosed with cancer.

When Carmen Garcia passed away last June, four of the children moved into the residence of Ines' oldest sister Migdalia, with the youngest child Angel Ivory moving to Minneapolis, Minnesota, to live with his father Gabriel Garcia.  As related in the letters annexed hereto as Exhibits "P"-"AA" Ines' mother has moved to 370 E. 142 Street, apartment 3C, where she resides alone with a daily health care attendant.  Receiving dialysis three times weekly and now 70 years of age she is visited almost daily by her children and their respective spouses.

Following release Ines intends to move into her mother's apartment to assist her with her daily needs.  He desires to acquire her GED during this time.  Upon completion her intention is to move to Minneapolis to reside with her deceased sister Carmen's husband, Gabriel Garcia, and their youngest child Angel Ivory to assist in rasing the young man with whom she has established an extremely close relationship.  This will provide Ms Sanchez with a stable environment, with financial support from Mr. Garcia while far removed from the Bronx.

### 3.  Post Offense Rehabilitation - Lack of Likelihood of Recidivism

Ines as described in detail above has taken every step possible to demonstrate her return to normalcy.  Pre- Booker, in United States v. Koon, supra, the Supreme Court found that the Sentencing Reform Act authorizes district courts to depart in cases that feature aggravating or mitigating circumstances of a kind or to a degree not adequately taken into consideration by the Sentencing Commission.

Justice Kennedy,  writing for the Court advises that the Sentencing Commission has

19

formulated each guideline to apply to a "heartland of typical cases". Atypical cases were "not adequately taken into consideration," and factors that may make a case atypical provide a potential basis for departure. Koon, supra, See U.S.Cr.L. Vol. 59, at p.2135.

In analyzing both Koon and post-Koon authority it is clear that certain general principals relevant to departure issues had been established. It is submitted that Post-Booker, these same factors are relevant under 18 U.S.C. 3553(a) the nature and circumstances of the commission of the offense and the background and characteristics of the defendant.

In the decisions of United States v. Workman, 80 F2d. 688 (2nd Cir.1996) and United States v. Maier, 975 F.2d 944, (2nd Cir., 1992), the Second Circuit has ruled that a downward departure, pursuant to Guideline section 5K2.0, based upon rehabilitation is permissible. In United States v. Core, 96-1790 (2nd Cir. 9/9/97) the Circuit held that a defendant's post-offense rehabilitation was a factor not adequately considered in the guidelines, and thus was a permissible basis for a downward departure. The court states that "awareness of one's circumstances and a demonstrated willingness to act to achieve rehabilitation, thereby benefitting the individual and society can remove a case from the heartland of typical cases, and thus constitute a valid basis for departure". Applying the analogy discussed above in the post-*Booker* era it is respectfully submitted that the Court may seek guidance in determining the appropriate sentence to impose in the context of the factors set forth in 18 U.S.C. 3553 by comparing how such a factor was considered pre-*Booker* in considering whether a departure pursuant to U.S.S.G. 5K2.0 was appropriate.

In Gall v. United States, 128 S. Ct. 586, 598 (2007) the Court states:

"It has been uniform and constant in the federal judicial tradition

20

> for the sentencing judge to consider every convicted person as an
> individual and every case as a unique study in the human failings that
> sometimes mitigate, sometimes magnify, the crime and punishment
> to ensue."

In the post-*Booker* era it is respectfully submitted that the Court may seek guidance in

determining the appropriate sentence to impose in the context of the factors set forth in 18 U.S.C.

3553 by comparing how such a factor was considered pre-*Booker* in considering whether a

departure pursuant to U.S.S.G. 5K2.0 was appropriate.

Pre- Booker, in United States v. Koon, supra, the Supreme Court found that the

Sentencing Reform Act allows district courts to consider aggravating or mitigating circumstances

of a kind or to a degree not adequately taken into consideration by the Sentencing Commission.

Justice Kennedy, writing for the Court advises that the Sentencing Commission has formulated

each guideline to apply to a "heartland of typical cases". Atypical cases were "not adequately

taken into consideration. Koon, supra, See U.S.Cr.L. Vol. 59, at p.2135. It is submitted that

Post-Booker, these same factors are relevant under 18 U.S.C. 3553(a) the nature and

circumstances of the commission of the offense and the background and characteristics of the

defendant.

Post offense rehabilitation has been recognized by numerous courts as a basis for the

imposition of a non-guideline sentence. In United States v. Hawkins, 380 F. Supp. 2d 143

(E.DN.Y. 2005) Judge Weinstein in a 46 page decision elaborates in detail how an analysis of the

factors set forth in 18 U.S.C. 3553(a) would warrant the imposition of a non-guideline sentence

where significant proof of post offense rehabilitation demonstrates that the likelihood of

recidivism is remote, the goals of deterrence have already been attained and the effects of

21

imprisonment upon the present life of the defendant would so adversely affect rehabilitation as to be inappropriate.

In United States v. Shy, 538 F. 3d 933 (8th Cir. 2008) as a consequence of the defendant's post offense rehabilitation, including contributions to society through her extraordinary work with persons with disabilities imposed a sentence of probation upon a defendant facing a sentencing range of 37-46 months. Court have similarly imposed non-guideline sentences based upon the defendant's good deeds, past integrity and exceptional charitable or community service. See United States v. Thurston. 544 F.3d 22 (1st Cir. 2008) (Court affirmed district courts imposition of 3 months rather than 60 months guideline term for Medicare fraud conspiracy of more than $5 million, citing, amongst other things the defendant's charitable and community service); United States v. Howe, 543 F.3d 128 (3rd Cir. 2008)(affirming sentence of 2 years probation with 3 months home confinement for wire fraud with Guideline range of 18-24 months, finding the conduct was an isolated mistake in the context of the defendant's entire life which was otherwise upstanding including devotion to family, community and his profession); and United States v. Cooper, 394 F.3d 172 (3rd Cir 2005) affirming a departure to probation where guidelines called for sentencing range of 14-21 months based upon defendants good works because they "entail hands on personal sacrifices which have a dramatic an positive effect upon the lives of others"). See, e.g. United States v. Bello, N0. 08 CR 801 (JBW), 2009 WL 1310791, at *2 (E.D.N.Y. 5/5/09)(It is unlikely that Bello will engage in criminal activity in light of his remorse, his devotion to family, and the support his family will and have provided to him while incarcerated and upon release); United States v. Hernandez-Castillo, No. 05 Cr. 1033 (RWS) 2007 (WL 168686, at *5(S.D.N.Y. 6/7/07)(Court notes the significant network of friends and

family that is already in place to support the defendant upon his release from prison).

As outlined above, over the past two years Ines Sanchez has demonstrated by her actions an extraordinary level of post-offense rehabilitation, which we implore the Court to consider .

**4.  A Downward Variance Pursuant to 18 U.S.C. 3553 is Warranted.**

U.S.S.G. §5K2.13 encourages a downward departure if the defendant committed the offense while suffering from "a significantly reduced mental capacity" and his reduced mental capacity "contributed substantially to the commission of the crime."  Significantly reduced mental capacity "means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." §5K2.13, cmt.(n.1)(2006).

As the reports of Dr. Goldsmith clearly evince at the time of the instant offense Ines Sanchez suffered from post traumatic stress disorder, chronic which:

> Because Ms. Sanchez had had the experience of being repeatedly exploited and sexualled abuse by men, she found her involvement with the gang to have bn an anxiety relieving experience with respect to her safety.  She states "Im around all these men where every man in my life had done something wrong to me.  But these gang members, I wasn't raped.  It made me feel wanted and protected."  She says, "no one could touch me or hurt me no more." Ms. Sanchez states that feeling of being protected and safe greatly diminished her anxiety.  Her mood improved.  She describes this feeling of safety as being the influential factor in her decision to take on the role of "godmother" to the gang."
>
> (See Exhibit "A" Goldsmith Report at page 5-6).

Many courts have downwardly departed pursuant to U.S.S.G. §2K2.23 where the defendant was diagnosed with similar mental impairments. In <u>United States v. Ruklick</u>, 919

F2d. 95, 97, 99 (8th Cir.) the court downwardly departed when the defendant suffered from

schizophrenic affective disorder that predated drug abuse and impaired the defendant's judgment.

In United States v. Silleg, 311 F.3d 557 (2nd Cir 2002) the Second Circuit affirmed a departure

pursuant to the section where the defendant suffered from bi-polar type II disorder.  See also

United States v. Santa, 2008 WL 2065560 (E.D.N.Y. May 14, 2008)(8 level downward departure

granted for significantly reduced mental capacity where the defendant's behavior was causally

linked to his mental condition.

It is submitted that close review of the nature of the instant offense and Sanchez' past

conduct helps to explain and form a better understanding of the true nature of her criminal

conduct warrant such a variance here.

The Supreme Court in Tennard v. Dretke, 124 S.Ct. 2562, 2571 (2004) stated impaired

intellectual functioning is inherently mitigating.   It is therefore submitted that Sanchez'

Criminal History Classification in Category IV significantly overstates the seriousness of her

prior conduct.   More importantly, as demonstrated by Dr. Goldsmith's evaluative report and, if

provided with intensive psychiatric treatment providing her with psycho-education

and the coping skills necessary to recovery from her  disorder the likelihood that the

defendant will commit further crimes will be reduced if eliminated in a much more viable

manner than punishment through imprisonment.  See United States v. Cernik, 2008 WL 2940854

(E.D. Mich. 2008 )(finding that "continued psychological therapy mandatory counseling... and

participation in relapse prevention therapy...will be far more effective in achieving the objectives

of §§3553(a)(2)© and (D) than would an extended term of imprisonment under the advisory

guideline range).

24

## 5. *The Kinds of Sentences Available*

A sentencing Court must consider all of the "kinds of sentences available" by statute, 3553(a), even if the "kinds of sentences...established [by] the Guidelines permit or encourage only prison. See Gall, 128 S.Ct. at 602 & n.11. Here, because the government has filed a motion pursuant to U.S.S.G. 5K1.1 and 18 U.S.C. 3553(e) the court may impose any sentence between zero to life imprisonment.

## 6. *Reflecting the Seriousness Of the Offense, Promoting Respect for the Law, Providing Just Punishment, Deterring Criminal Conduct, Protecting the Public, and Providing Vocational Training.*

18 U.S.C. requires courts to impose a sentence sufficient but not greater than necessary to reflect the seriousness of the offense, promoting respect for the law, providing just punishment, deterring criminal conduct, protecting the public, and providing vocational training. All of those sentencing objectives can be attained by imposing a non-Guidelines sentence.

As noted in the PSR and the annexed letters of friends and family make clear this is a woman who is a truly changed person, consumed with the need change her ways care for her family and overcome with remorse for her mistakes during her involvement with the members of the BHB Gang. The circumstances relative to the defendant, her life and her offense conduct militate in favor of some lenity.

## III.  CONCLUSION

When the Court imposes sentence upon a person, it naturally takes into account many factors, including the traditional objectives of deterrence, punishment and rehabilitation, carefully balanced by the gravamen of the offense, the defendant's culpability, his background and any particular factors about the defendant that should and do demand special attention.

25

The Court is well aware of the facts of this case, having been provided the extensive case history set forth in the Presentence Report and this document and therefore such will not be reviewed any further herein.  In determining the sentence to be imposed, the Court is faced with the task of balancing society's interests with those of the defendant.  In analyzing that juxtaposition, we would impress upon the Court Ines Sanchez background, the nature and circumstances of her participation in the offense, her close family ties, mental health treatment and extraordinary efforts she has undertaken over the past two years to rediscovery her life and move forward as a meaningful contributor to both her family and society.

As the Hon. Alvin K, Hellerstein has so aptly observed:

> Rehabilitation is also a goal of punishment 18 U.S.C. 3553(a)(2)(D).  That goal cannot be served if a defendant can look forward to nothing beyond imprisonment.  Hope is the necessary condition of mankind, for we are all created in the image of God.  A judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life.  Punishment should not be more severe than that necessary to satisfy the goals of punishment.

United States v. Carajal, 2005 WL 476125 (SDNY February 22, 2005).

These are indeed the type of factors that 18 U.S.C. 3553(a) and in the post Booker era Gall v. United States, 552 U.S. 85 (2007), Kimbrough v. United States, 552 U.S. 85 (2007) and United States v. Crosby, supra mandate that the court consider in imposing sentence. Jamie Kinsley asks that the court consider these factors in determining what sentence should be imposed.

It is respectfully requested that a sentence of 20 months imprisonment with conditions of mental health treatment would be a sentence "sufficient but not greater than necessary" to

26

accomplish the sentencing goals articulated in 18 U.S.C. 3553(A).  For all of these reasons it is

respectfully requested that the Court sentence the defendant in such manner.

Dated: Lake Success, New York
        August 16, 2018

Respectfully submitted,

Alan M. Nelson, Esq.

cc: AUSA Jared Lenow
    USPO Tandis Milani
    Ines Sanchez

27

EXHIBIT "A"